UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDER GROUP, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>COMERICA BANK,<br><br>        Defendant. | Case No. 25-cv-00044-WHO<br><br>**ORDER GRANTING COMERICA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 36, 37, 39, 40, 42, 43, 45, 46, 48, 49 |

Defendant Comerica Bank ("Comerica") moves for summary judgment that it is entitled to accelerated payments of a loan issued to plaintiff Alexander Group, LLC ("Alexander Group") after Alexander Group allegedly violated various conditions of its loan agreement, including a coterminous provision, an agreement to provide corporate financial documents, and failure to make timely loan payments. Comerica also moves for summary judgment on the doctrine of unclean hands, which it claims bars Alexander Group from seeking equitable relief. In the alternative, Comerica seeks leave to file a supplemental answer to the complaint, raising an unclean hands defense. Alexander Group, in turn, asserts that acceleration is not warranted in these circumstances given the ambiguity in the contract, and that there is no evidence in the record suggesting bad faith on its part.

I do not find that Alexander Group acted with unclean hands. But the loan documents in question are unambiguous. Alexander Group triggered acceleration of payment by failing to adhere to the loan's requirements. Comerica's motion for summary judgment is GRANTED.

## BACKGROUND

**1. Plaintiffs Enter into Loan Agreements with Defendants.**

Alexander Group is a "single purpose entity formed to hold title to the real property

located at 25447 Industrial Boulevard, Hayward, California" (the "Property"). Comerica Bank's Motion for Summary Judgment ("Mot.") [Dkt. No. 36] at 9. Blue River Seafood, Inc. (d/b/a Pucci Foods) ("Blue River") is a seafood wholesaler that operates in the Property. *Id.*; Alexander Group, LLC's Opposition ("Oppo.") [Dkt. No. 40] at 2. Chris Lam ("Mr. Lam") is the principal of both Alexander Group and Blue River, having acquired Blue River in 2001. *Id.*

Shortly after acquiring Blue River, Mr. Lam met with Robert Muzio, a Comerica banker who "specialized in serving middle-market companies like Blue River." Oppo. at 2. Comerica extended a loan to Blue River in August 2001 (the "Blue River Loan"). Mot. at 9–10. This loan was made with "revolving lines of credit secured by the company's accounts receivables and inventory." Oppo. at 2. Later, in August 2002, Comerica entered a separate real estate loan with Alexander Group (the "Alexander Loan"), which was secured by a first priority deed of trust in Comerica's favor on the Property. Mot. at 10. Because Blue River's rent payments to Alexander Group were the source of Alexander Group's funds to pay off the Alexander Loan, Blue River was added as a guarantor to the loan (the "Blue River Guaranty"). Mot. at 10. Lam also served as a guarantor to the Alexander Loan. *Id.*

**2. The Parties Begin to Modify the Terms of the Loan Agreements.**

Over the course of the Alexander Loan, Comerica and Alexander Group entered into various agreements increasing the amount of the loan and changing the terms of repayment. Three of these amendments are central to this case.

**A. The Fourth Agreement**

On or around October 10, 2016, the parties agreed to increase the amount of the Alexander Loan from $4,670,000.00 to $5,900,000.00 (the "Fourth Agreement"). *Id.* (citing Declaration of Thao Nguyen ("Nguyen Decl.") [Dkt. No. 36-3] ¶ 10). During negotiations leading up to the execution of the Fourth Agreement, Lam and Comerica agreed that Blue River would be released as a co-guarantor to the Alexander Loan. *Id.* at 11 n.1; Oppo. at 2. In exchange, however, Alexander Group agreed to furnish "within ninety (90) days after the end of its fiscal year . . . a full and complete financial statement concerning [Alexander Group's] income, expenses, assets, and liabilities applicable or attributable to the Property and the operations thereof." Thao Decl.

Ex. 4 ("Fourth Agreement") ¶ 7.7.  Comerica also required Lam to "furnish . . . a personal financial statement, in a form satisfactory to [Comerica], on an annual basis." *Id.* (collectively, the "Financial Information Clauses").  In addition, the Fourth Agreement required Alexander Group to "[m]aintain a Debt Service Coverage Ratio of at least 1.20 : 1.00 at all times." *Id.* ¶ 7.14.[1]  Should Alexander Group "default in the performance of any covenant, condition or agreement set forth," the Fourth Agreement provided Comerica the right to "[d]eclare the Note immediately due and payable." *Id.* ¶¶ 8.1, 9.1.

### B. Amendment No. 1

Later, in 2021, several banks began to offer to refinance the Alexander Loan on a competitive basis.  Oppo. at 3.  Lam told Ms. Thao Nguyen, who worked with Muzio, about the opportunity to compete for the Blue River and Alexander Group loans.  *Id.*  Comerica then offered Lam to increase the Alexander Loan to $9,750,000 for a 7-year or 10-year term, and to increase the Blue River loan to $4,500,000 for a 12-month period.  *Id.*; Declaration of Christopher Lam ("Lam Decl.") [Dkt. No. 40-1] ¶ 10.  However, much to Lam's chagrin, this offer was conditioned on each loan being "cross-defaulted," meaning that default on one loan would trigger a default on the other.  *Id.*  These terms were "unacceptable" to Lam because he sought to "separate the obligations of Alexnader Group from the obligations of Blue River." Lam Decl. ¶ 11.  In response, Comerica decided to delete the cross-default provision from the agreement; Lam, in turn, decided to stay with Comerica.  *Id.*

On April 15, 2021, Lam signed and returned the updated agreement, selecting a 10-year "Fixed SWAP Option" for the Alexander Loan.  *Id.* ¶ 12.  However, after signing the commitment, Comerica sought new requirements to the loans in Amendment No. 1 to the Fourth Agreement ("Amendment No. 1").  These conditions were allegedly desired because Comerica's underwriting department determined that an increase in the Alexander Loan, in light of the release of the Blue

---

[1] The Debt Service Coverage Ratio ("DSCR") requires Alexander Group to "have 1.20 times in net income as compared to its debt." Mot. at 11.  While Comerica originally argued that Alexander Group violated this provision, thus triggering the loan's acceleration clause, Comerica withdrew this argument after discovering that previous computations of the DSCR may have been incorrect in its motion for summary judgment.  *See* Defendant Comerica Bank's Notice of Partial Withdrawal [Dkt. No. 41].

3

1  River guaranty, made the loan too risky.  Mot. at 11; Declaration of Cheryl M. Lott ("Lott Decl.")
2  [Dkt. No. 36-1] Ex. A ("Nguyen Dep.") at 21:17–23:12, 34:24–35:22.  Therefore, Comerica
3  included Section 7.18 to Amendment No. 1, the "Coterminous Provision."  Mot. at 11.  This
4  provision provides:

> 7.18 **Coterminous Payment**: In the event that the Blue River [Loan] is refinanced with another lender or otherwise terminated by Borrower prior to payment in full of the Indebtedness, Borrower shall refinance the Loans with another lender or otherwise pay the Loan and other Indebtedness in full.

Nguyen Decl. Ex. 12 ("Amendment No. 1"), Section 7.18.

The parties dispute why the provision was added.  Alexander Group contends that Nguyen told Lam that "Comerica is not a transactional lender, and that Comerica wanted to keep the banking relationship for Mr. Lam's entire business enterprise."  Oppo. at 4.  The Coterminous Provision was thus "intended to prevent [Lam] from splitting up his business between different banks; if one of the borrowers (Alexander Group or Blue River Seafood) decided to take its banking business elsewhere, the other borrower was required to repay its loan at the same time."  *Id.*  Lam also contends that there was "no discussion" between him and Nguyen about Alexander Group's obligations to repay the Alexander Loan before the maturity date if Comerica decided not to extend the Blue River line of credit.  *Id.* (citing Lam Decl. ¶ 17).  He asserts that he "would not have agreed to the coterminous provision in Amendment No. 1 if that meant that Comerica had the option to make the Alexander Group loan due in 12 months, when the Blue River Seafood line of credit matured."  *Id.*

Comerica paints a different picture.  It contends that it required the Coterminous Provision in Amendment No. 1 "because, if Blue River refinanced the Blue River Loan, Comerica would have no visibility into Blue River's financial performance, which was the sole source of repayment of the Alexander Loan."  Mot. at 12 (citing Nguyen Dep. pp. 39:10–18, 54:21–24).  Because the Alexander Loan payments were contingent on Blue River's lease payments, "visibility into Blue River's cash flow [was thought to be] critically important to Comerica in determining the Alexander Loan's risk profile."  *Id.*

Amendment No. 1 also included new representations and warranties.  Specifically, the

4

Amendment incorporated the Blue River Loan, noting that:

> Borrower has also requested certain amendments and credit accommodations for its commonly controlled affiliate in an amendment to the Blue River Credit Agreement and Blue River Line of Credit ("Blue River Facility"). The Bank is relying on the existence of both the amended Blue River [Loan] and the amended Loan Agreement in agreeing to enter into this Amendment, increase the amount of the Loans and amend the Blue River [Loan]."

Amendment No. 1, Section 5.

On May 3, 2021, the parties executed Amendment No. 1. Oppo. at 5. The agreement specified that the maturity date for the Alexander Loan was March 31, 2031. *Id.* Two days later, Comerica and Alexander Group signed a SWAP Agreement, which kept Alexander Group's interest rate constant at 3.95% (a 2.15% SWAP rate plus 1.80% spread). *Id.*; Lam Decl. Ex. E.

**C. The Fifth Note**

In 2023, Comerica notified Lam that the Alexander Loan would need to be "redocument[ed]," as the global banking industry was required to discontinue the use of LIBOR benchmark rate. Mot. at 13; Oppo. at 6. Redocumenting the loan required replacement of "both the promissory note and the SWAP Agreement, because both . . . used LIBOR as the benchmark rate." Oppo. at 6. On February 23, 2023, the parties entered a fifth amended and restated note (the "Fifth Note") to convert the rate of the Alexander Loan from LIBOR to Bloomberg Short-Term Bank Yield Index ("BSBY"). Mot. at 13. Section 8.6 of the Fifth Note incorporates the Fourth Agreement, Amendment No. 1, and all previous documents into the Fifth Note. Nguyen Decl. Ex. 7 ("Fifth Note"), Section 8.6. Specifically, the term provides:

> This Note and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof . . .

*Id.* The Fifth Note later defines Loan Documents as:

> [C]ollectively, this Note and all other documents, instruments, and agreements evidencing, governing, securing, guaranteeing or otherwise relating to or executed pursuant to or in connection with this Note or the Indebtedness evidenced hereby (whether executed or delivered prior to, concurrently with or subsequent to this Note), as such documents, instruments or agreements may have been or may hereafter be amended from time to time.

5

*Id.* The Fifth Note also clarifies that it is meant to serve as the final agreement between the parties:

> This Note amends, restates, supersedes and replaces that certain Fourth Amended and Restated Note Secured by Deed of Trust dated as of October 10, 2016, in the principal amount of Five Million Nine Hundred Thousand Dollars ($5,900,000) executed by Borrower and payable to the order of Bank as amended and subsequently increased to $9,750,000 (the "Prior Note"); provided, however, (i) the execution and delivery by Borrower of this Note shall not, in any manner or circumstance, be deemed to be a payment of, a novation of or to have terminated, extinguished or discharged any of Borrower's indebtedness evidenced by the Prior Note, all of which indebtedness shall continue under and shall hereinafter be evidenced and governed by this Note, and (ii) all Collateral and guaranties securing or supporting the Prior Note shall continue to secure and support this Note.

*Id.* Section 10. The Fifth Note states that the "MATURITY DATE" of the loan is March 31, 2031, the same date that the parties agreed to in their Fourth Note in 2021. Oppo. at 6.

### 3. Plaintiffs Allegedly Breach the Alexander Loan.

#### A. Coterminous Provision

Beginning in September 2023, plaintiffs began engaging in conduct that defendants contend amounts to a breach of the Alexander Loan, thus triggering the acceleration clause. First, in mid-September 2023, the corporate controller for Blue River, Sami Grewal ("Greweal"), notified Comerica of "irregularities in Blue River's accounting transactions." Mot. at 15; Nguyen Decl. ¶ 15; Nguyen Dep. pp. 77:24–78:10. Lam was on a business trip in Vietnam at the time, and was not able to speak with Grewal about her concerns due to spotty internet connection. Oppo. at 7. Later, on September 18, 2023, Grewal resigned from her position, "citing Blue River's irregular accounting transactions as the reason for resignation." Mot. at 5; Nguyen Decl. Ex. 9 ("Grewal Resignation"); Oppo. at 7.

Comerica subsequently began to conduct a series of audits of Blue River Seafood in September and October 2023. *Id.* at 8; Mot. at 15. Comerica identified "Various invoices Blue River accounted for as 'paid' that lacked supporting documentation and/or any shipment of product," amounting to $1,663,000.00. Mot. at 15. Lam declared that he never had such inventory on hand, nor that the products had been shipped to the customers. *Id.*; Lam Dep. pp.

35:15–36:12, 37:14–22, 41:21–46:4, 64:20–65:4.

On September 28, 2023, Comerica notified Blue River that it deemed itself "insecure," and exercised its right under the Blue River Loan to accelerate repayment of the loan. Mot. at 15–16; Declaration of Jim Petroff ("Petroff Decl.") [Dkt. No. 36-2] Ex. A ("Blue River Default Letter"). In other words, Alexander Group was made aware that Comerica "did not intend to extend the maturity date of the Blue River Seafood line of credit beyond May 1, 2024, which was the maturity date at the time, and that Blue River Seafood must repay the loan." Oppo. at 8.

The parties dispute what happened next. Comerica contends that Blue River "strung Comerica along for over a year under the guise of negotiating a forbearance agreement to buy itself time to explore re-financing options." Mot. at 16. It also contends that Blue River "made payments on the Blue River Loan to induce Comerica to entertain forbearance negotiations," as well as continued to draw down on its credit line. *Id.* Alexander Group, conversely, notes that Blue River was actively searching for replacement financing at the time. Oppo. at 8. Both parties agree that Blue River eventually received long term funding from National Oceanic and Atmospheric Administration ("NOAA") and Access Business Finance ("ABF") programs to assist with the re-financing process. *Id.*; Mot. at 16.

Alexander Group maintains that "[r]eplacing the . . . short-term Blue River Seafood line of credit" with the NOAA and ABF loans was a "very positive outcome for Blue River Seafood, in that the company would thereafter have loans that were designed to provide the company with a predictable and well-designed plan of financing as opposed to Comerica's short-term line of credit financing." Oppo. at 6. This, in turn, "significantly reduced Alexander Group's risk of non-repayment because Blue River Seafood was put on sound financial footing." *Id.* Nonetheless, on September 25, 2024, Comerica notified Alexander Group that the loan was immediately due because the refinancing triggered the Coterminous Provision in Amendment No. 1. Mot. at 16; Petroff Decl. Ex. B ("Notice of Default").

**B. Financial Statements**

In addition to the Coterminous Provision, defendants maintain that Alexander Group failed to provide Comerica with its financial statements within ninety days after the end of the 2024

7

1 fiscal year, in violation of the Financial Information Clauses. Petroff Decl. ¶ 10. Alexander
2 Group also failed to provide Lam's tax returns within seven business days of filing the returns,
3 also in violation of the Financial Information Clauses. *Id.* Defendants contend that this
4 independently warrants acceleration of the Blue River Loan under the Fourth Agreement. Mot. at
5 16–17.

### C. Failure to Make Timely Payments

Finally, Alexander Group is alleged to have failed to make timely payments on the Alexander Loan in August, September, and October 2025. Mot. at 18.; Petroff Decl. ¶¶ 12–14; Nguyen Dep. pp. 51:17–53:1, 62:18–63:16. Alexander Group admits that the August and September payments were untimely, but asserts that the October 2025 payment was timely. Oppo. at 19. In August 2025, the automatic payment system for the Alexander Loan was rejected because there were insufficient funds in its commercial checking account. Petroff Decl. ¶ 13. As a result, Lam deposited a personal check to assist with paying the loan on August 4, 2025. *Id.*; Oppo. at 19. Similarly, in September 2025, an automatic payment was rejected due to insufficient funds; Lam again provided personal funds to pay the loans on September 9, 2025. *Id.* Because payment was not effectuated "within 24 hours of the notice to Mr. Lam, on or about September 5, 2025, Comerica notified Alexander Group and Mr. Lam . . . [that it was] demanding full payment of Alexander Group's outstanding liabilities on the Alexander Loan. *Id.* On September 29, 2025, in preparation for the October 2025 payment, Lam deposited funds to bring the Alexander Loan account to a sufficient balance to cover the payment. Mot. at 18–19. However, "because these funds exceeded a certain threshold, the funds were 'held' until October 7, 2025," thus making them untimely. *Id.* at 19.

### 4. Procedural History

On November 5, 2024, Alexander Group filed a complaint for declaratory relief in Alameda County Superior Court, "seeking to resolve the question of whether Alexander Group may repay the Alexander Loan in regular monthly payments, or whether Comerica may accelerate the Alexander Loan." Mot. at 19; Lott Decl. Ex. C ("State Complaint") ¶ 7. On January 2, 2025, this case was removed to federal court. *See* Notice of Removal [Dkt. No. 1].

8

1    Comerica moved for summary judgment on October 22, 2025.  Mot.  On the same day, it
2    filed a motion to leave to file a supplemental answer to Alexander Group's complaint, claiming
3    that new evidence showed that an affirmative defense of unclean hands should be added to its
4    answer.  *See* Motion for Leave to File Supplemental Answer ("Leave Mot.") [Dkt. No. 37].
5    Alexander Group responded to both motions on November 5, 2025.  *See* Oppo.; Alexander Group,
6    LLC's Opposition to Comerica's Motion for Leave ("Leave Oppo.") [Dkt. No. 39].  Comerica
7    replied on November 12, 2025.  *See* Defendant Comerica Bank's Reply to Opposition ("Repl.")
8    [Dkt. No. 42]; Defendant Comerica Bank's Reply in Support of Motion for Leave ("Leave Repl.")
9    [Dkt. No. 43].  I heard oral argument on November 25, 2025.

## LEGAL STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the district court must draw all reasonable factual inferences in favor of the non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

**I.  Acceleration of the Alexander Loan**

The parties first dispute whether Alexander Group breached the Alexander Loan, thus triggering an acceleration of payments on the loan.  Defendants maintain that three independent events triggered an acceleration of the Alexander Loan: (1) the Coterminous Provision of the Fourth Agreement; (2) the failure to make timely loan payments in August, September, and October 2025; and (3) the failure to timely provide corporate financial documents.  Mot. at 21.  I agree that each independently warrant acceleration.

**a.  Coterminous Provision**

The Coterminous Provision of the parties' agreement states: "In the event that the Blue River Credit Line is refinanced with another lender or otherwise terminated by Borrower prior to payment in full, Borrower shall refinance the Loan with another Lender or otherwise pay the Loan and other Indebtedness in full."  While the parties do not dispute the existence of the Coterminous Provision, they disagree over whether it is susceptible to more than one interpretation considering extrinsic evidence.  This requires me to consider whether the parol evidence rule is applicable, and if so, to what extent.

**1.  Parol Evidence Rule**

"The parol evidence rule prohibits the introduction of oral or written evidence to vary or contradict the terms of an integrated written contract."  *Traumann v. Southland Corp.*, 842 F. Supp. 386, 390 (N.D. Cal. 1993) (citing *Masterson v. Sine*, 68 Cal.2d 222 (1968)).  It is presumed that the parties' "written agreement constitutes the final and absolute expression of the result of all negotiations."  *Id.* (citing *Gerdlund v. Electronic Dispensers Int'l*, 190 Cal. App. 3d 263 (1987)).  To this end, the parol evidence rule will only "exclude extrinsic evidence if the contract at issue is integrated."  *Id.*  Whether the parties intended for a contract to be integrated is a question of law.  *See FPI Development, Inc. v. Nakashima*, 231 Cal. App. 3d 367, 392 n.12 (1991).

Here, each iteration of the Alexander Loans contains an integration clause.  While those clauses are admittedly worded slightly different from one another, the applicability of the provision is similar across each version.  For example, the clause from the Fourth Amended

10

1   Agreement reads:

2
> This Agreement, the other Loan Documents and the Environmental
> Indemnity Agreement constitute the entire understanding between the
> parties regarding the matters mentioned or incidental to this
> Agreement. The Loan Documents and the Environmental Indemnity
> Agreement supersede all oral negotiations and prior writings
> concerning the subject matter of the Loan Documents and the
> Environmental Indemnity Agreement, including any inconsistent
> terms of Bank's loan commitment to Borrower, if any; ***provided,
> however***, that all obligations of Borrower under any loan commitment
> (including, without limitation, the obligation to pay any fees to Bank
> and any costs and expenses relating to the Loan) shall survive the
> execution and delivery of this Agreement, the other Loan Documents
> and the Environmental Indemnity Agreement, and any failure by
> Borrower to perform any such obligation shall constitute an Event of
> Default hereunder. If there is any conflict between the terms,
> conditions and provisions of this Agreement and those of any other
> agreement or instrument, including any of the Loan Documents or the
> Environmental Indemnity Agreement, the terms, conditions and
> provisions of this Agreement shall prevail. This Agreement may not
> be modified, amended or terminated except by a written agreement
> signed by each of the parties hereto.

Declaration of Thao Nguyen ("Nguyen Decl.") [Dkt. No. 36-3] Ex. 4 ("Fourth Amended Agreement") § 12.4; *see also id.* Ex. 5 ("First Amendment to Fourth Agreement") § 8; *id.* Ex. 7 ("Fifth Amended Agreement") § 8.6. These provisions all suggest that the terms of the loan were meant by the parties to be an integrated agreement.

While the presence of these clauses is "strong evidence of the parties' intent . . . it is not dispositive." *Traumann*, 842 F. Supp. 3d at 390 (citing *Slivinsky v. Watkins-Johnson Co.*, 221 Cal. App. 3d 799 (1990)). Alexander Group argues that there are enough ambiguities in the evidence to suggest extrinsic evidence should be used, regardless of the integration clause. It first argues that the Coterminous Provision says nothing about the Blue River line of credit, and that if it were the intention of the parties to require Alexander Group to pay the Alexander Loan when the Blue River line of credit was repaid, it would have been worded more explicitly. Oppo. at 10. Further, the use of "terminated by Borrower" language in the Coterminous Provision suggests that the parties did not contemplate the Provision to cover termination by the Lender, and that reading it otherwise would render the language superfluous. *Id.* Alexander Group also cites to Lam and Nguyen's conversations regarding the cross-default provisions, wherein Comerica agreed to remove these terms at Lam's request. Lam Decl. ¶¶ 10–11. Finally, Comerica agreed to extend

11

1   the maturity date of the Alexander Group loan by 10 years, to March 2023, while at the same time
2   extending the maturity date of the Blue River line of credit by one year, to May 2022. Oppo. at
3   11. Alexander Group believes this evidence makes the "contractual language . . . susceptible to
4   more than one reasonable interpretation" and concludes that summary judgment is "improper
5   because 'differing views of the intent of parties will raise genuine issues of material fact.'" Oppo.
6   at 12 (citing *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th
7   Cir. 1997).

8         I disagree. Construing all evidence in the light most favorable to Alexander Group, I do
9   not see how this evidence points to ambiguity. First, the argument about the superfluous
10  "terminated by Borrower" language is unconvincing. The Coterminous Provision reads: "if the
11  Blue River Credit Line is *refinanced with another lender or otherwise terminated* by Borrower
12  prior to payment in full, Borrower *shall* repay the Loan in full." While Alexander Group focuses
13  on the second clause of the Provision—"terminated by Borrower"—it seems to completely ignore
14  that acceleration may occur when the Blue River Credit Line is refinanced. Repl. at 6–7. That is
15  exactly what happened here: in response to Comerica declaring itself insecure, Alexander Group
16  re-financed with funding from NOAA and ABF. Mot. at 16. Because the circumstances in
17  question are squarely covered in the Coterminous Provision, accelerating Alexander Group's loans
18  was warranted.

19        Additionally, that Alexander Group read the entire loan agreements multiple times before
20  signing, including the Coterminous Provision, lends credence to Comerica's argument. *See*
21  *Traumann*, 842 F. Supp. at 390. Even if Lam and Alexander Group had a subjective
22  understanding of what they *thought* these provisions meant, that belief does not override the clear,
23  unambiguous language of the Coterminous Provision. Each subsequent version of the loan
24  agreement integrated the previous agreements, indicating that Alexander Group had multiple
25  opportunities to clarify the scope and interpretation of these provisions. Instead, the parties
26  entered the Fourth Note, Amendment No. 1, and the Fifth Note with each other, binding
27  themselves to the Coterminous Provision.
28        Lam and Alexander Group may have been confused given that they executed numerous

12

amendments over a short period. Any subjective confusion does not override the terms of an unambiguous contract.

### 2. Because Blue River Refinanced the Blue River Loan, Acceleration was Warranted.

#### a. Refinancing

The parties also disagree whether Blue River "refinanced" its loan such that it was subject to acceleration by Comerica. Comerica maintains that it is "undisputed that Blue River refinanced the Blue River Loan in September 2024." Mot. at 26 (citing Declaration of Jim Petroff ("Petroff Decl.") [Dkt. No. 36-2] at ¶ 9 ("In September 2024, Blue River entered into agreements . . . to refinance its obligations under the Blue River Loan.")). While Alexander Group did not dispute this point in its opposition, at oral argument, it clarified that the parties purportedly had different definitions of the term "refinance," and that in its view, its actions did not constitute refinancing the loan. It also filed a supplemental brief on this issue, *see* Supplemental Brief Request for Leave ("Suppl.") [Dkt. No. 48], that Comerica opposed. *See* Objections to Request for Leave ("Suppl. Oppo.") [Dkt. No. 49].[2]

Alexander Group's supplemental brief raises a few new arguments regarding the definition of "refinancing." First, it points to Section 2924c of the California Civil Code, which it argues states that it may reinstate an accelerated loan by "paying all amounts due, 'other than the portion of principal as would not then be due had no default occurred.'" Suppl. at 1 (citing Cal. Civ. Code § 2924c(a)(1)). It also objected to Comerica's reference to Section 2924.7 of the Civil Code, as it believes that section only applies to a "failure to pay insurance premiums, taxes, rents, assessments, or advances as required by the mortgage," which is not at issue here. *Id.* Finally, it contends that the California Uniform Commercial Code indicates that the term "refinanced" is "not defined," and whether the term "encompass[es] a particular transaction depends upon whether, under the particular facts, the purchase-money character of the security interest fairly can be said to survive." *Id.* at 1–2; Cal. U. Com. Code § 9103, Comment 7(b).

---

[2] While I agree with Comerica that this motion is untimely under Local Rule 7-3(d)(1), I address Alexander Group's arguments to demonstrate that its position also lacks merit.

13

1   Alexander Group's arguments are not well-taken. While Alexander Group is correct that
2   under Section 2924c, "the mortgagor [has] a right to cure a default by paying the amount in
3   default, plus 'reasonable expenses and costs,' thereby reistating the loan as if the default had not
4   occurred," it does not show that it actually paid the amount in default and was thus entitled to
5   reinstatement. *Walker v. Countrywide Home Loans, Inc.*, 98 Cal. App. 4th 1158, 1173 (2002)
6   (quoting Cal. Civ. Code § 2924c(a)(1)). Additionally, Alexander Group cites no authority
7   suggesting that Section 2924.7 *only* allows acceleration upon the "failure to pay insurance
8   premiums, taxes, rents, assessments, or advances." Finally, the California Uniform Commercial
9   Code does not apply in this case, as the loan in question is secured by real property, not personal
10  property. *See* Nguyen Decl. ¶¶ 8–10; *Garcia v. Fed. Home Loan Mortg. Corp.*, No. 1:12–cv–
11  00397–AWI–BAM, 2012 WL 3756307, at *4 (E.D. Cal. Aug. 28, 2012) ("The California
12  Commercial Code does not apply to real property . . .").

13  Alexander Group's eleventh-hour argument does not cure its failure to raise this issue
14  earlier, nor is it supported by the law. Even after drawing all inferences in favor of Alexander
15  Group, it is clear that the plain meaning of "refinance" should be used to determine whether the
16  Coterminous Provision was violated.

### 3.  Acceleration was Warranted

18  Turning to the merits of the parties' arguments, acceleration was warranted. Alexander
19  Group argues that under "controlling case law, a lender can only accelerate a loan if the default
20  impaired the lenders' security. Otherwise, acceleration is an unenforceable penalty or forfeiture."
21  Oppo. at 13. To this end, Alexander Group cites two cases it believes control this issue.

22  First, in *Brown v. AVEMCO Investment Company*, 603 F.2d 1367 (9th Cir. 1979), the
23  Ninth Circuit found that acceleration clauses are "not to be used offensively, e.g., for the
24  commercial advantage of the creditor." *Id.* at 1376. Rather, acceleration is a "matter of equity and
25  the courts, including those of [the state], have historically been careful to evaluate the fairness of
26  acceleration in the particular facts of a case." *Id.* But *Brown* arises out of Texas contract law;
27  Alexander Group even recognizes this in its opposition. *See* Oppo. at 13 n.4 ("The loan
28  documents provide that California law applies. *Brown* was decided under federal common law

14

and Texas law."). This Texas principle has not been extended to any California state contract claims, and there is no reason to do so here.

Further, Alexander Group relies on *Freeman v. Lind*, 181 Cal. App. 3d 791 (1986), to argue that California law places significant limits on a "lender's right to accelerate a loan notwithstanding an acceleration clause in the loan documents." Oppo. at 14. In *Freeman*, the parties entered into a contract for the sale of a parcel of property, set to be paid in monthly installments. 181 Cal. App. 3d at 794. The note was secured by a deed of trust that contained an acceleration clause. *Id.* at 794–95. During the repayment period, the borrower breached a provision in the loan requiring it to maintain fire insurance on the property. *Id.* at 795. While the parties both acknowledged that the borrower knew of both the fire insurance provision and the acceleration clause, the borrower argued that acceleration was unwarranted because the lack of insurance did not impact the security of the loan. *Id.* at 798. A panel on the California Court of Appeal agreed, finding that a "trustee or beneficiary may not foreclose under an acceleration provision in a deed of trust . . . unless the[ir breach] impairs the security of the deed of trust. It is a question of fact whether the [breach] impairs the security of the deed of trust." *Id.* at 807.

Relying on *Freeman*, Alexander Group argues that the "relevant question here is not only whether Alexander Group is in default," but *also* "if, as a result, Comerica's security is impaired." Oppo. at 15. Because "substantial, admissible evidence [shows] that Comerica's security was *not* impaired," Alexander Group concludes no acceleration is warranted. Oppo. at 15. But what Alexander Group fails to mention is that *Freeman* has been abrogated by subsequent statutory authority in California. Under California Civil Code § 2924.7, lenders may "accelerate the maturity date . . . upon the failure . . . to pay, at the times provided for under the terms of the deed of trust or mortgage, any taxes, rents, assessments, or insurance premiums . . . *whether or not impairment of the security interest in the property has resulted from the failure*." Cal. Civ. Code § 2924.7 (emphasis added). The California Legislature statutory note to Section 2924.7 specifically notes that the statute abrogated the *Freeman* decision:

> It is the intent of the Legislature to abrogate the holdings in cases such as . . . *Freeman v. Lind* (181 Cal. App. 3d 791) to the extent those holdings in any way restrict the right of a beneficiary or mortgagee

15

under a deed of trust or mortgage on real property to enforce the express provisions of the deed of trust or mortgage.

Accordingly, to accelerate a defaulted loan, California law simply requires showing that the "right to accelerate . . . [is] clear and unequivocal" in the contract, and that there is "[no] reasonable doubt as to the meaning of the terms employed." *In re Crystal Properties, Ltd., L.P.*, 268 F.3d 743, 751 (9th Cir. 2001) (quoting *First Bank Inv'rs Trust v. Tarkio Coll.*, 129 F.3d 471, 475 (8th Cir. 1997)). As discussed above, this standard is met here: Section 9.1 of the Fourth Agreement states that in the event of "default in the performance of any covenant, condition or agreement set forth," Comerica retained the right to "[d]eclare the Note immediately due and payable." Fourth Agreement, Section 9.1. Both parties recognize that the Coterminous Provision is a clear condition on the Fourth Agreement and subsequent loan agreements. Therefore, because Alexander Group's refinancing of the Blue River loan triggered the default provision, Comerica was well within its authority to accelerate the loans. No material fact presented by Alexander Group reasonably contradicts this finding, even after viewing all evidence in a light most favorable to its position.

      b.    **Untimely Payments**

Next, Comerica argues that Alexander Group's untimely payments of the Alexander Loan triggered default and acceleration of the loan. I agree.

Section 8 of the Fourth Agreement sets out the events that constitute default; they include any "default in the performance of any covenant, condition or agreement set forth" in the agreement, including the timely payment of the Alexander Loan. Fourth Agreement, Section 8.1. Under Section 9, Comerica was entitled to declare a loan "immediately due and payable" upon breach of one of the Section 8 terms, including untimely payments. *Id.*, Section 9. Comerica asserts that Alexander Group's failure to timely its loan obligations in August, September, and October 2025 triggered Section 9 and warranted acceleration.

Alexander Group does not contest that the August and September payments were late, and argues that its October payment was timely, despite the "hold" placed on its funds. Oppo. at 19. It contends that this was a "minor transgression . . . unrelated to the claim at issue in the complaint," an argument which would be more apt for Comerica's unclean hands defense. *Id.*

16

Alexander Group presents no evidence that would suggest why the acceleration clause would not be triggered for such a clear violation as its failure to pay. Accordingly, acceleration was independently warranted on the basis of Alexander Group's repeated failure to timely pay off its loans.

### c. Financials and Tax Returns

Finally, Comerica argues that Alexander Group's failure to provide the company's annual financial disclosures, along with Lam's failure to provide his personal tax returns, constituted default under Section 9.1 of the Fourth Agreement, thus triggering acceleration. Mot. at 23–24. At the time of filing its motion for summary judgment, Comerica argued that Alexander Group had *still* not provided them with the financial documents. *Id.* However, in its reply, Comerica noted that Alexander Group ultimately provided these documents to them on October 23, 2025, one day after filing its motion for summary judgment.[3] Regardless of this late filing, Comerica contends that there is no genuine dispute of material fact that it was within its right to accelerate the loan after Alexander Group failed to adhere to the Financial Information Clauses. *See* Fourth Agreement, Section 7.1.

Alexander Group admits to filing these documents late; in its opposition, it concedes to "submitt[ing] its 2024 financial statement on September 19, 2025, and its 2024 tax return on October 23, 2025." Oppo. at 20. This timing violated the Fourth Agreement's Financial Information Clauses, which indicated all financial information be submitted within ninety days of the close of the fiscal year, or in the case of Lam's tax returns, within seven business days of filing. Mot. at 23. Like the Coterminous Provision and untimely payments, this failure to adhere

---

[3] Comerica's reply also indicates that these tax returns show "(1) Alexander Group is in fact in violation of the DSCR, and (2) that Alexander Group provided Comerica and the IRS with inaccurate financial information as the rental income reported on each not only conflict with each other, but conflict with the actual rental deposits made into Alexander Group's account." Repl. at 9. Because Comerica previously retracted its DSCR argument due to lack of evidence, *see* FN 1, it now asks that I allow Comerica to reinstate its claim that Alexander Group's violation of the DSCR clause triggered acceleration. *Id.*; *see* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . give an opportunity to properly support or address the fact."). Because Alexander Group's breach of the Coterminous Provision, Financial Information Clauses, and timely payment provision all independently warrant acceleration, I do not find it necessary to consider Comerica's DSCR argument.

17

1 to the terms of the Fourth Agreement properly triggered the acceleration clause upon default.
2 Alexander Group provides no evidence or explanation suggesting otherwise.

Alexander Group breached the Coterminous Provision, made untimely payments, and failed to provide timely financials and tax returns.  Each breach entitled Comerica to accelerate the loan agreement.  It is entitled to summary judgment as a result.  Its alternative request to amend its answer to state an unclean hands defense is DENIED as moot.

## CONCLUSION

Comerica's motion for summary judgment is GRANTED.  The Clerk shall enter Judgment in accordance with this Order.

**IT IS SO ORDERED.**

Dated: January 6, 2026



William H. Orrick
United States District Judge

18